ATTORNEY-GENERAL *(ex rel. Holden)* v. COLBURN.

In an appropriate action for a judicial trial and settlement of the title to an office, the common law gives judgment for the candidate for whom competent evidence shows a majority of the legal votes were intended, and this rule is not altered by the statutes relating to the election of supervisors.

A vote cast in town-meeting is not rendered illegal or insufficient by the fact that the first name of the person voted for is indicated upon it by a single letter. The provision that it shall not be counted is inoperative.

QUO WARRANTO, to determine the title to the office of third supervisor of the town of Temple. Facts found by a referee. The defendant's full name is Elias Everett Colburn; and there

was in the town no other person named Elias E. Colburn, or E. Everett Colburn.   At the November election in 1880, the first ballot for third supervisor was declared void, and no one claims under it.   The result of the second ballot was,—

| | |
|---|---|
| Whole number of votes | 101 |
| Necessary for a choice | 51 |
| E Everett Colburn had | 3 |
| Elias E Colburn had | 48 |
| James M. Holden (the relator) had | 50 |

and the moderator declared there was no choice.

The result of the third ballot was,—

| | |
|---|---|
| Whole number of votes | 101 |
| James M. Holden had | 50 |
| Elias E. Colburn had | 51 |

and the defendant, having a majority, was declared elected.

*Morrison & Bartlett*, for the relator.

*C. H. Burns*, for the defendant.

Doe, C. J.   The relator contends that the three votes cast on the second ballot for "E Everett Colburn" cannot be counted. Their rejection would reduce the whole number to ninety-eight, and make the fifty, given for the relator, a majority; and if he had a majority on the second ballot, the third would be immaterial in this suit.   The evidence reported by the referee is competent to prove the fact that the three votes for "E Everett Colburn," and the forty-eight for "Elias E Colburn," were intended for the defendant; and there is no conflict of evidence.   On the second as well as the third ballot, the defendant had a majority: and by the common law, in this appropriate action for the judicial trial and settlement of the title, it being proved by competent evidence that a majority of the votes were intended for him, he is entitled to judgment.   Cool. Con. Lim. 607–611; *Clark* v. *Board*, 126 Mass. 282, 285; *Prince* v. *Skillin*, 71 Me. 361; *Att'y-Gen.* v. *Megin*, 63 N. H. 378.   This rule is not altered by any statute relating to the election of supervisors.

"Every male inhabitant   . . .   of twenty-one years of age and upward, excepting paupers and persons excused from paying taxes at their own request, shall have a right   . . .   to vote   . . . for the senator.   . . .   And every person qualified as the constitution provides shall be considered an inhabitant, for the purpose of electing and being elected into any office or place within this state, in the town, parish, and plantation where he dwelleth and hath his home.   . . .   The meetings for the choice of governor, council, and senators shall be   . . .   governed by a moderator, who shall,   . . .   in open meeting, receive the votes of

all the inhabitants of such towns and parishes present and qualified
to vote for senators; and shall   .   .   .    count the said votes, and
make a public declaration thereof, with the name of every person
voted for, and the number of votes for each person." Constitution,
Art. 28, 30, 32. The qualifications of electors of representative,
governor, and councillor are the same as those of electors of sena-
tor.  Art. 13, 42, 60.  The same qualifications are generally pre-
scribed in the choice of other officers. G. L., *c.* 29; *c.* 87, *s.* 6.

Citizenship is an implied qualification. 7 Mass. 524–526; 8 N.
H. 574, 575. It might be claimed that some degree of mental
capacity and soundness is another. It might be claimed that a
blank piece of paper is not a vote, but a refusal to vote. If all the
ballots cast for supervisor had been blanks, there would have been
no choice. They would have had no more electoral effect than so
many written refusals to exercise electoral power. If but one
paper were cast, and that a blank, it would elect nobody. And it
may be a question whether a paper containing and intended to con-
tain no evidence of a purpose to vote for some person can be con-
sidered as a vote, or be counted as an expression of a voter's choice,
and whether a statute forbidding the counting of such papers is
anything more than a statement of the meaning of the constitu-
tion. But on no sound rule of interpretation can the constitution
be held to require either a Christian name, or a name of more
than one letter, as a qualification for the office of governor, coun-
cillor, senator, or representative. If the legislature can disfranchise
a voter or candidate for want of a Christian name or for want of a
certain number of letters in his whole name or in some part of it
(a point on which we express no opinion), the disfranchising power
has not been exercised.

"Where the constitution has conferred a political right or
privilege, and   .   .   .    has not particularly designated the man-
ner in which that right is to be exercised, it is clearly within the
just and constitutional limits of the legislative power to adopt any
reasonable and uniform regulations, in regard to the time and
mode of exercising that right, which are designed to secure and
facilitate the exercise of such right in a prompt, orderly, and con-
venient manner. Such a construction would afford no warrant for
such an exercise of legislative power as, under the pretence and
color of regulating, should subvert or injuriously restrain the right
itself.   .   .   .

"As to many of those elections,   .   .   .    the constitution is
silent upon the question whether the votes shall be given   .   .   .
*vivâ voce,* or by ballot. But for this law [Mass. St. 1798, *c.* 31, *s.*
3, requiring written votes], all qualified voters might claim the
right of voting *vivâ voce.*   .   .   .    But we think it cannot be
doubted that this is a just exercise of legislative power, providing
an easy and reasonable mode of exercising the constitutional right,
and one calculated to prevent error and fraud, to secure order and

regularity in the conduct of elections, and thereby give more security to the right itself. . . .

"This court is of opinion that the provision in the general law regulating elections, and that in the act incorporating the city [of Boston], which require that the qualifications of voters shall be previously offered and proved, in order to enable them to vote, that their names shall be entered upon an alphabetical register or list of voters, is highly reasonable and useful, calculated to promote peace, order, and celerity in the conduct of elections, and as such to facilitate and secure this most precious right to those who are by the constitution entitled to enjoy it; that it cannot be justly regarded as adding a new qualification to those prescribed by the constitution, but as a reasonable and convenient regulation of the mode of exercising the right of voting, which it was competent to the legislature to make; and therefore that these legal enactments, not being repugnant to the constitution, are valid and binding laws, to which both voters and presiding officers at elections are authorized and bound to conform." *Capen* v. *Foster*, 12 Pick. 485, 489, 490, 492.

"While it is true that the legislature cannot add to the constitutional qualifications of electors, it must nevertheless devolve upon that body to establish such regulations as will enable all persons entitled to the privilege to exercise it freely and securely, and exclude all who are not entitled from improper participation therein. . . . Under such a regulation (requiring a check-list previously prepared), the officers . . . are enabled to proceed with more deliberation, . . . to avoid the haste and confusion that must attend the determination upon election day of the various and sometimes difficult questions concerning the right of individuals to exercise this important franchise. Electors, also, by means of this registry, are notified in advance what persons claim the right to vote, and are enabled to make the necessary examination to determine whether the claim is well founded, and to exercise the right of challenge if satisfied any person registered is unqualified. . . . The provision for a registry deprives no one of his right, but is only a reasonable regulation under which the right may be exercised. . . . All such regulations of the constitutional right, which seem to the legislature important to the preservation of order in elections, to guard against fraud, undue influence, and oppression, and to preserve the purity of the ballot-box, are not only within the constitutional power of the legislature, but are commendable, and at least some of them are absolutely essential. . . . All regulations of the elective franchise, however, must be reasonable, uniform, and impartial; they must not have for their purpose directly or indirectly to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise; if they do, they must be declared void." Cool. Con. Lim. 601, 602; Ang. & A. Corp., *s.* 351.

In *Davis* v. *School-District*, 44 N. H. 398, a majority of the court held that a statutory requirement of six months' residence is a reasonable regulation of the mode of proving the constitutional right, and not an imposition of an additional qualification. Without the support of long usage and general acquiescence, it is by no means certain that this requirement would have been sustained. It is at least doubtful whether the decision has been accepted by the profession as sound, and it must be regarded as an exceptional precedent, affording no ground of legal principle or analogy for the decision of other cases in which the judgment is not controlled by such considerations of usage and acquiescence as had an influence in that case. In the present case there are no such considerations. If any ballots containing the initials only, or other abbreviations, of first Christian names have been rejected, the practice has not been so extensive as to show a general understanding that their rejection is legal.

The Revised Statutes of 1842 (*c.* 25, *s.* 8) provided that " each ballot shall contain the name of every person voted for. . . . Blank pieces of paper shall not be counted." By Laws of 1853, *c.* 1423, it was enacted that "All ballots that shall hereafter be given in at any election of town, state, or county officers, shall have written or printed upon them the full Christian and surname of the person voted for: *Provided*, that the middle name . . . may be indicated . . . by the initial letter or letters." In the revision of 1867, the commissioners condensed and united the Act of 1853 and *s.* 8, *c.* 25 of the Rev. St., intending no alteration of the sense of either. Their proposed form was, " The full Christian and surname of every person voted for, with the initial letter or letters of the middle name, . . . shall be written or printed upon every ballot; and blank pieces of paper shall not be counted." Com'r's Rep., *c.* 29, *s.* 8. The commissioners seemed to understand the Act of 1853 to be merely directory. The attention of the legislature being thus called to the distinction between a directory and a mandatory act, they amended the form proposed by the commissioners, and made the Act of 1853 mandatory. "And every ballot not thus prepared and cast shall be regarded as a blank, and not counted." Gen. St., *c.* 28, *s.* 8; G. L., *c.* 31, *s.* 2.

For at least one reason, the moderator's refusal to count the three votes objected to by the relator would have been illegal. Neither in its original nor in its present form was the statute designed to require any other qualifications than those which the legislature can prescribe for all state officers. It does not require more letters in the name of a supervisor than in the name of a governor. It has no reference to the question whether there must be more letters in the name of a councillor than in the name of á voter, a person signing a will or a contract, a plaintiff, or a defendant in a civil or criminal suit. It was not based on the idea that, either as a matter of law or a matter of fact, a name, long enough for all other busi-

ness is not long enough for use in an election. It did not alter the legal principle that recognizes as sufficient any name, however short, which a man chooses to accept or adopt, or by which he is commonly known. It was not intended, and therefore cannot be held, to require any person to have more than one letter for his full Christian name for any purpose. It was intended to avoid inconveniences caused by votes on which a first name, consisting of several letters, is not written or printed in full. The prescribed remedy is, that such votes shall not be counted by the moderator. But as no method is provided by which he can ascertain the full first name of the person voted for, and as its ascertainment requires an investigation which he is not authorized to make and which would be inconsistent with his official duties, the mandatory provision that votes shall not be counted cannot be carried into effect. It was inadvertently enacted upon the erroneous supposition that a name necessarily consists of more than one letter, and that a vote containing but one letter for a first Christian name could not be what the statute was intended to require, and therefore could be rejected without investigation.

If the letter E had been the whole of the defendant's first Christian name, and the fifty-one votes intended for him on the second ballot had been cast for " E Everett Colburn," the statute requiring " the full Christian and surname" would have been complied with, and it would have been the moderator's duty to count those votes and declare the defendant elected. In such a case the moderator could not officially know that the letter E was not the whole of the first Christian name of a person for whom the majority of the votes were intended. In the present case, if the moderator had known there was no eligible person of that name, his knowledge on this point would have been useless. He had no authority to use such knowledge in determining what votes he should count. His duty was prescribed by law, and the law did not make the rights of voters depend upon his accidental knowledge or ignorance of the eligibility of persons voted for. The existence and eligibility of a person whose full name was E Everett Colburn, were judicial questions which he could not decide without hearing the evidence that might be offered, and he was not authorized to stop the count and hold a court. He was not a judge of the election, but a ministerial officer like a canvasser of returns.

" The counting the votes, and ascertaining the majorities, and giving certificates of the result, are mere ministerial acts." *Strong, Petitioner*, 20 Pick. 484, 497. " The duties of the board of examiners are simply ministerial. . . . Thy are not made a judicial tribunal, nor authorized to decide upon the validity or the fact of the election, in any other mode than by an examination of the returns made to them, according to law. They are not required or authorized to hear witnesses, or weigh evidence. They have no power to send for persons or papers. If one result appears upon

the returns, and another is the real truth of the case, they can only act upon the former." *Luce* v. *Mayhew*, 13 Gray 83, 84, 85. "It is quite usual to express the Christian name of persons, both in their own signatures. and by other persons, by one letter only, although a single letter rarely constitutes the whole Christian name. . . . Upon a case of a controverted election, brought before a legislative body vested with the power of determining the elections, returns, and qualifications of its own members, or presented to a judicial tribunal by information in the nature of a *quo warranto*, or other proper process to try the title to an office, evidence of extrinsic circumstances, such as that no other person of corresponding initials resided in the same city or county, or had been nominated by public convention or otherwise for the office in question, may be introduced, and may satisfy the tribunal having authority to receive and consider it, that votes describing the Christian name by a single letter were intended for the same person as votes setting forth at length a Christian name having a corresponding initial. But the board of examiners cannot receive or consider such extrinsic evidence, and is confined to the records of votes returned and laid before it according to the statute. Upon the face of the returns, the votes cast for L. Clark, of Springfield, may possibly indicate a person whose whole Christian name consists of the letter L., or more probably a person having a name of which this letter is the initial, and which may be either Leonard, or Lewis, or Luther, or any other name beginning with this letter. This is the utmost that can be known from the returns, taken by themselves." *Clark* v. *Board*, 126 Mass. 282, 285, 286 ; 64 Me. 596 ; 53 N. H. 640 ; 58 N. H. 621 ; *Osgood* v. *Jones*, 60 N. H. 273, 282.

In this case, the moderator was a canvasser, authorized to receive, sort, and count the votes, and make a public declaration of them, with the name of every person voted for, and the number of votes for each person. He must necessarily pass upon the question of the identity of each voter. But his incidental power did not extend beyond the necessarily implied means of exercising his express power. When he received each ballot, it was his duty to examine it so far only as to determine whether it contained more than one ticket, and to place it in the balloting-box "without inspecting the name of any person voted for." G. L., *c.* 31, *s.* 3. When he took the votes out of the box, and proceeded to sort, count, and declare them, he had no judicial power to try the question whether E Everett Colburn was the full name of an eligible person, and no legal means of officially knowing that the three votes containing that name did not comply with the statute requiring the first Christian name in full. He could no more refuse to receive or refuse to count a vote cast for a person unknown to him, or known by him to be ineligible, than he could refuse to receive and count a vote offered by a person who he knew was not a legal voter, but whose name was on the check-list. The judicial

question of the right to vote was determined before the election by the proper officers. The same question, and the existence and eligibility of a person receiving a majority of the votes for supervisor, could be determined after the election by another tribunal. Great dangers attend a non-observance of the distinction between judicial duty, including a fair trial, and ministerial duty in the discharge of which no trial is necessary. The legislature did not intend that a vote containing a full Christian name should be rejected when that name is a single letter, or that the question whether a Christian name of a person voted for contains more than one letter should be tried by the moderator for the purpose of deciding whether a vote should be counted. The intention was, that a vote on which the first Christian name is but one letter should be rejected by the moderator without trial, and without any other information than that given by the vote. But this purpose is in conflict with the intent to make no change in the law which permits one letter to be a name; and the mandatory clause, that votes shall not be counted, is inoperative because it is incapable of execution without a trial of a question which the legislature intended should not be tried under that clause for the purpose of enforcing it.

In counting the three votes, and declaring no choice, on the second ballot, the moderator did his duty. If he had refused to count them, and had declared Holden elected, he would have been guilty of usurpation, and, on *quo warranto* brought by Colburn, Holden would have been ousted.

*Judgment for the defendant.*

All concurred.